UNITED STATES of America ex
rel. Janet CHANDLER,
Ph.D., Plaintiff,

v.

THE HEKTOEN INSTITUTE FOR MEDI-
CAL RESEARCH; Cook County Hospi-
tal; and Cook County, Illinois, Defen-
dants.

No. 97 C 514.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 9, 1999.

John F. Belcaster, Miner, Barnhill & Galland, Chicago, IL, Ronald L. Futterman, Michael I. Behn, Futterman & Howard, Chartered, Chicago, IL, Bradley Scott Weiss, Law Office of Bradley Scott, Washington, DC, Michele Marion Fox, United States Atty's Office, Chicago, IL, for plaintiff.

Timothy F. Haley, Noah A. Finkel, Steve A. Miller, Seyfarth, shaw, Fairweather & Geraldson, Thomas M. Burnham, Donna M. Lach, Sanjay Thakor Tailor, State's Attorney of Cook County, Patricia M. Moser, City of Chicago, Dept. of Law, Chicago, IL, for defendants.

## *MEMORANDUM OPINION AND ORDER*

GETTLEMAN, District Judge.

Relator/plaintiff Janet Chandler ("plaintiff") has brought a three-count complaint against defendants the Hektoen Institute for Medical Research ("Hektoen"), Cook County Hospital ("CCH"), and Cook County (together, "the County Defendants"). Plaintiff alleges: (1) presentation of false claims in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. (Count I); (2) retaliation in violation of the FCA (Count II); and (3) retaliatory discharge in violation of Illinois law and public policy (Count III).

Defendant Hektoen moves to dismiss Counts I and III, arguing that: (1) the FCA's qui tam provisions are unconstitutional; and (2) plaintiff does not allege that Hektoen's actions violated clearly established Illinois public policy. Hektoen has also moved for an extension of time in which to answer Count II, pending the court's decision on the County Defendants' motion to dismiss Count II. The United States has filed an amicus brief in opposition to Hektoen's argument that the qui tam provisions of the FCA are unconstitutional.

The County Defendants have likewise filed a motion to dismiss the complaint, arguing that: (1) CCH is not a suable entity under Illinois law; (2) Count II fails to state a claim against the County Defendants because plaintiff was employed by Hektoen, not by the County; (3) the County Defendants are immune from punitive damages for Count III; (4) Count III fails to state a claim for retaliatory discharge; and (5) the qui tam provisions of the FCA are unconstitutional. The County Defendants have filed a supplemental motion to dismiss, arguing that they are not "persons" who can be sued under the FCA.[1]

### FACTS

This action arises out of defendants'[2] alleged misconduct in implementing a federal research grant. In 1989, the National Institute of Drug Abuse ("NIDA") issued a request for proposals for a study investigating the treatment of drug-dependant pregnant women. In response, CCH submitted a grant application seeking $5 million to study 300 such women over the course of five years (the "New Start study"). CCH also submitted an Assurance of Compliance plan to a division of the United States Department of Health and Human Services ("HHS"). In this plan, CCH represented that its study would comply with federal regulations gov-

---

1. On January 7, 1999, the court issued an opinion compelling defendants to produce certain documents and denying defendants' request that the court stay its discovery decision pending its decision on defendants' motions to dismiss. On January 13, 1999, the County Defendants filed a Motion for Reconsideration of a portion of the court's January 7 opinion, requesting that the court stay discovery pending its decision on the immunity claim defendants raised in their supplemental motion to dismiss.

2. The court does not differentiate between Hektoen and the County Defendants when discussing parts of plaintiff's complaint where she uses the term "defendants" to refer jointly to all defendants.

erning research on human subjects. NIDA initially awarded the grant to CCH (which developed the protocol to be used in performing the study), and later transferred the administration of the grant to Hektoen. Plaintiff was hired by Hektoen as New Start's project director on September 1, 1993.

The federal grant had two components. The clinical component was designed to provide the research subjects with a comprehensive medical and social service program that included drug treatment and prenatal care. The research component was designed to study whether the research subjects had benefitted from the comprehensive treatment program.

Plaintiff alleges that during her employ, she became aware that defendants were not complying with the terms of the grant or with federal regulations and were misrepresenting the progress of the New Start study. Specifically, plaintiff alleges that defendants: did not follow the mandatory protocol associated with research on human subjects and the dispensing of methadone to pregnant women; did not obtain informed consent from study participants; did not obtain thorough medical or drug histories from the participants; provided the participants with substandard care; failed to keep accurate records; and failed to randomize participants. Plaintiff also alleges that defendants reported "ghost" research subjects and submitted false progress reports to the government. Finally, plaintiff alleges that defendants violated the grant and federal law because they did not have procedures in place to protect whistleblowers from retaliation.

Plaintiff alleges that in 1994, she began informing doctors employed by CCH of her concerns that the study was violating the terms of the grant, the Assurance of Compliance plan, and federal regulations. She alleges that after reporting her concerns, Dr. Mason, an employee of CCH, rescinded a number of her responsibilities. Plaintiff also alleges that Hektoen retaliated against her by recalculating her vacation and sick time. According to plaintiff, after she reported in a draft of her paper for NIDA that the study

had not been successful, she was further chastized by employees of both CCH and Hektoen. On January 24, 1995, John Prochaska ("Prochaska"), the administrator of Hektoen, accused plaintiff of lying in her monograph on the study and fired her. On February 21, 1995, plaintiff was formally removed as co-principal investigator of the study. Plaintiff subsequently testified at an HHS Commission on Research Integrity hearing, and in August 1996, a subdivision of HHS issued a report on the research conducted by CCH and Hektoen that identified "multiple failures to comply with requirements of the HHS human subjects regulations."

## DISCUSSION

### I. Defendant Hektoen's Motions

#### A. Motion to Dismiss Count I

Hektoen moves to dismiss Count I on the grounds that the qui tam provisions of the FCA are unconstitutional.[3] Hektoen argues: (1) qui tam relators do not have Article III standing to bring an FCA claim; (2) the qui tam provisions violate separation of powers principles by encroaching on the authority of the executive branch, U.S. Const., Art. II, § 3; and (3) the qui tam provisions violate the Constitution's Appointments Clause, U.S. Const., Art. II, § 2. Defendants rely primarily on the reasoning of a lone decision from the Eastern District of Texas, *United States ex rel. Riley v. St. Luke's Episcopal Hospital*, 982 F.Supp. 1261 (S.D.Tex.1997). The overwhelming majority of courts that have considered the issue have upheld the qui tam provisions of the FCA in the face of identical constitutional challenges.

#### 1. Standing

■ Defendants argue that plaintiff does not have Article III standing to bring suit under the qui tam provisions of the FCA because she does not allege an injury-in-fact, one of the three elements of Article III standing, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Seventh Circuit has

---

**3.** The County Defendants incorporate this argument by reference in their motion to dismiss.

held that because the United States is the real party in interest in a qui tam action, a relator has standing to pursue the suit as long as the federal government has suffered an injury-in-fact. *See United States ex rel. Hall v. Tribal Development Corp.,* 49 F.3d 1208, 1214 (7th Cir.1995) ("It is enough ... that the United States, as the entity on whose behalf and in whose name this suit was brought, has suffered an injury in fact under Article III. Requiring an additional showing of injury on the part of the qui tam relator would be an analytical redundancy.").

Although defendants acknowledge the existence of *Hall,* they urge this court to abjure binding precedent in favor of the reasoning of *Riley,* a district court decision from another circuit that explicitly disagreed with *Hall. See Riley,* 982 F.Supp. at 1266. Defendants also argue that *Hall* is not binding on this court because it did not arise under the FCA. However, *Hall* relied on FCA cases to draw its ultimate conclusion that qui tam relators need not demonstrate an injury-in-fact. *See U.S. v. Johnson,* 43 F.3d at 1214 (quoting the Second Circuit's holding in *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1154 (2d Cir. 1993): "[i]n a qui tam action [under the False Claims Act], the plaintiff sues on behalf of and in the name of the government and invokes the standing of the government resulting from the fraud injury."). The FCA comports with the principle that "if an injured person assigns his right of action to someone else, the assignee has standing to enforce the right even though he is not the one who was injured by the defendant's wrongdoing." *National Ass'n of Realtors v. National Real Estate Ass'n, Inc.,* 894 F.2d 937, 941 (7th Cir.1990).

Other courts have used similar reasoning to hold that qui tam relators have standing to bring suit under the FCA. *See, e.g., United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 748 (9th Cir.1993) ("the FCA effectively assigns the government's claims to qui tam plaintiffs such as Kelly, who then may sue based upon an injury to the federal treasury."); *United States ex rel. Lamers v. City of Green Bay,* 924 F.Supp. 96, 98 (W.D.Wis. 1996) (agreeing with *Kelly*); *United States*

*ex rel. Robinson v. Northrop Corp.,* 824 F.Supp. 830, 836 (N.D.Ill.1993) ("Congress ... can transfer the rights of the United States to private citizens, and because it did just that through the FCA, plaintiffs have standing to sue."). The court finds that plaintiff has standing to bring this suit.

### 2. Separation of Powers

██ Hektoen also argues that the FCA's qui tam provisions violate the principle of separation of powers because they grant Congress exclusive control over executive functions. Article II vests the executive branch with the power to execute the laws. Because the FCA includes a number of provisions that enable the executive branch to maintain control over qui tam suits, the statute does not arrogate the executive function to Congress. Section 3730(b)(2) explicitly gives the Attorney General the authority to intervene and protect the interests of the executive branch, and § 3730(c)(2) gives the government the authority to dismiss or settle the action even if the relator objects. Although Hektoen argues that the government no longer retains control over the present litigation because it has declined to intervene, the FCA grants the government the right to intervene at any time upon a showing of good cause. *See* 31 U.S.C. § 3730(c)(3).

This court follows the vast majority of courts that have considered this issue and finds that the FCA does not run afoul of the separation of powers doctrine. *See United States ex rel. Taxpayers Against Fraud v. General Elec. Co.,* 41 F.3d 1032, 1041 (6th Cir.1994); *Kelly,* 9 F.3d at 755 ("[T]he FCA gives the Attorney General sufficient means of controlling or supervising relators to satisfy separation of powers concerns."); *Kreindler,* 985 F.2d at 1155 ("[T]he FCA qui tam provisions do not usurp the executive branch's litigating function because the statute gives the executive branch substantial control over the litigation."); *see also Robinson,* 824 F.Supp. at 837. *But see Riley,* 982 F.Supp. at 1269 n. 5 (noting in a footnote that "the qui tam provisions of the False Claims Act also raise serious constitutional concerns as to whether Congress may delegate the

executive powers of law enforcement to private parties ...").

### 3. Appointments Clause

■ Finally, Hektoen argues that the FCA's qui tam provisions violate the Appointments Clause, which vests the executive branch with the exclusive power to appoint officers to execute the laws of the United States. Numerous other courts have held that qui tam relators are not officers within the meaning of the Appointments Clause. *See, e.g., Taxpayers Against Fraud,* 41 F.3d at 1041 (holding that relators are not "officers" because the government may take control of such cases whenever it wishes, and because the relator's position is without tenure or continuous duties); *Kelly,* 9 F.3d 743, 757 (holding that unappointed qui tam relators do not wield so much governmental power that their appointments must conform to the requirements of the Appointments Clause); *Robinson,* 824 F.Supp. 830, 836 (holding that relators are not officers because they seek to vindicate not only public rights, but their own private rights as well).

Hektoen argues that qui tam relators are officers by analogizing them to special prosecutors. The court notes that the Seventh Circuit has likewise analogized relators to prosecutors, *see Hall,* 49 F.3d at 1213, and has never expressed any concern that these private parties are "officers" appointed by Congress in violation of the Appointments Clause. The court finds that relators are unlike prosecutors because they are suing to protect private rights, not just the public interest, and because they stand to reap private financial gain. Moreover, because the government retains the right to intervene in a relator's suit at any time, relators do not weild enough governmental power to be officers under the Appointments Clause. The court finds that the FCA's qui tam relator provisions are constitutional, and therefore denies Hektoen's and the County Defendant's motions to dismiss Count I.

### B. Motion to Dismiss Count III

Hektoen moves to dismiss Count III of plaintiff's complaint, arguing that plaintiff cannot state a claim for retaliatory discharge under Illinois law. Hektoen asserts that plaintiff does not allege a violation of a clearly mandated public policy, and that even if she could allege such a violation, the FCA provides her with an adequate remedy.

■ An employee can state a claim for retaliatory discharge only if she can demonstrate that she was terminated in retaliation for her actions, and that the discharge contravenes a clear mandate of public policy. *See Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981); *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353 (1978). "[P]ublic policy ... is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions." *Palmateer,* 85 Ill.2d at 130, 52 Ill.Dec. 13, 421 N.E.2d 876. A plaintiff can survive a motion to dismiss only if she can show that the cited provision embodies a public policy and that the plaintiff's termination violates this public policy. *See Callozzo v. Office Depot, Inc.,* 1998 WL 111628, at *2 (N.D. Ill. Mar. 6 1998) (citing *Barr v. Kelso–Burnett Co.,* 106 Ill.2d 520, 527, 88 Ill.Dec. 628, 478 N.E.2d 1354 (1985)).

■ Although plaintiff alleges retaliatory discharge, she does not identify the source of the public policy that defendants allegedly violated in terminating her. Plaintiff has not cited any statutory, constitutional, or other provision in her complaint. Rather, she merely alleges that she was terminated because she took steps to promote the health and safety of the research subjects, their fetuses, their offspring, and the public at large. Efforts to promote health and safety, standing alone, are not enough to make out a claim for retaliatory discharge. In *United States ex rel. Dihu v. IIT Research Institute,* 1998 WL 299390 (N.D.Ill. May 21, 1998), for example, a plaintiff brought an FCA claim and alleged retaliatory termination under both the FCA and state law. Although the plaintiff was concerned that certain practices at IIT were jeopardizing the health and safety of the workers, the only provision he cited was an internal Army regulation. *See id.* at *8. The court held that the plaintiff did not state a claim for retaliatory discharge because the regulations he cited did not have

enough of a widespread impact on the state's citizens to embody public policy. *See id.* Plaintiff must invoke a rule that defendants violated in terminating her in order for the court to evaluate whether the violation of that rule violates state public policy.

Plaintiff may be attempting to argue that her termination contravened a public policy embodied in the FCA. However, the Illinois Supreme Court generally finds that only those statutes that impact the health and safety of citizens in general truly express public policy. *See Hamros v. Bethany Homes and Methodist Hosp. of Chicago,* 894 F.Supp. 1176, 1179 (N.D.Ill.1995) (citing cases). Plaintiff does not argue that the FCA affects the health and welfare of citizens in general. The intent of the FCA is to protect the federal government, not individual citizens. Moreover, plaintiff does not advance any state law or public policy that prohibits fraud against the federal government. *See, e.g., Adler v. Continental Ins. Co.,* 1996 WL 677085, at \*10 (D.Kan. Nov. 1, 1996) (finding that alleged retaliation in violation of the FCA did not contravene Kansas public policy because "there is no clearly established Kansas public policy aimed at preventing fraud against the federal government").

■ Even if plaintiff could properly allege that her discharge violated some clearly mandated state public policy, the court finds that Illinois courts would not expand the tort of retaliatory discharge to this case because the remedies embodied in the FCA serve as an adequate deterrent to future employer misconduct. As this court explained in *Hamros:* "Historically, courts have recognized the [retaliatory discharge] claim where the otherwise available remedies would not serve as an effective deterrent...." 894 F.Supp. at 1179 (citing cases). Plaintiff argues that the Seventh Circuit has allowed plaintiffs to proceed with state retaliatory discharge claims that are supported by the same facts as federal claims, citing *Wright v. Illinois Dep't of Children & Family Services,* 40 F.3d 1492, 1508 (7th Cir.1994) (arising under § 1983); and *Gooden v. Neal,* 17 F.3d 925, 929 (7th Cir.1994). *Gooden* held that the plaintiff's retaliatory discharge claim was

distinct from his First Amendment claim. *See* 17 F.3d at 929 ("To prevail under state law Gooden did not have to establish that his reports were protected speech, and the tort of retaliatory discharge in Illinois has not developed in precisely the same way as constitutional torts....").

Unlike the First Amendment, the FCA contains a specific provision that punishes employers who discharge employees in retaliation for exercising their rights under the statute. See § 3730(h). In this respect the FCA is analogous to the FMLA, which this court and other courts have held provides a remedy that adequately deters retaliatory discharge. *See Callozzo,* 1998 WL 111628, at \*5; *Hamros,* 894 F.Supp. at 1179. Like the FMLA, the FCA provides for a number of statutory remedies, including liquidated damages (in the form of a double back pay award) designed to deter the employer from future unlawful conduct. *See Hamros,* 894 F.Supp. at 1179; *see also Dihu,* 1998 WL 299390, at \*8 ("In this case, Dihu's Illinois claim essentially mirrors his retaliatory discharge claim under § 3730(h) of the FCA, and thus recognition of the Illinois common law claim is not necessary for Dihu to obtain the relief he seeks"). The court concludes that plaintiff has failed to demonstrate that her discharge controverts established Illinois public policy, and that even if she had shown a violation of public policy, the FCA provides her with an adequate remedy. The court grants Hektoen's motion to dismiss Count III of plaintiff's complaint.

## II. County Defendants' Motions

### A. Supplemental Motion to Dismiss FCA Claims (Counts I and II)

The County Defendants argue that they cannot be sued under the FCA because: (1) the County is not a "person" under the FCA; and (2) the FCA's treble damages provision is punitive, and municipalities are exempt from punitive damages. Defendants rely primarily on a New York district court decision, *United States ex rel. Graber v. City of New York,* 8 F.Supp.2d 343 (S.D.N.Y.1998). Although this is a case of first impression in this circuit, the weight of authority in other circuits holds that states are persons within

the meaning of the FCA and that the FCA's treble damages provision is not punitive.

### 1. The County is a "Person" Under the FCA

■ The court considers two factors in determining whether the County is a "person" under the FCA: (1) the text of the statute; and (2) its legislative history. The statute renders liable "any person who" submits false claims to the federal government. 31 U.S.C. § 3729(a). The FCA does not define the term "person" as used in § 3729(a). However, the civil investigative demand provision of the act includes in its definition of person "any State or political subdivision of a State." 31 U.S.C. § 3733(1)(4). In addition, courts have interpreted the statute to include states among the "person[s]" who may file qui tam actions under § 3730(b). *See, e.g., United States ex rel. Stevens v. State of Vermont Agency of Natural Resources,* 162 F.3d 195, 205 (2d Cir.1998) (holding that in light of the legislative history of § 3730(b), "Congress viewed the States as persons who could be qui tam plaintiffs"); *United States ex rel. Woodard and State of Colorado v. Country View Care Center, Inc.,* 797 F.2d 888, 893 (10th Cir. 1986); *United States ex rel. Hartigan and State of Illinois v. Palumbo Brothers, Inc.,* 797 F.Supp. 624, 631 (N.D.Ill.1992) ("We conclude that the FCA was specifically amended to provide jurisdiction for qui tam plaintiffs like Illinois.").

The court concludes that Congress intended the word "person" to have the same meaning in each section in which it is used. *See Commissioner v. Lundy,* 516 U.S. 235, 250, 116 S.Ct. 647, 133 L.Ed.2d 611 (1996) (applying the "normal rule of statutory construction that identical words used in different parts of the same act are intended to

have the same meaning") (internal citations omitted). The text of the statute and other federal courts' interpretation thereof suggest that states and their political subdivisions are "person[s]" under § 3729(a). *Accord Stevens,* 162 F.3d at 205; *United States ex rel. Zissler v. Regents of the University of Minnesota,* 154 F.3d 870, 875 (8th Cir.1998).[4]

The legislative history of the FCA likewise suggests that Congress intended to include states and other units of local government as "persons" who can be sued under the act. The Senate Report accompanying the 1986 amendments to the FCA, in a section describing the history of the act, states: "The False Claims Act reaches all parties who may submit false claims. The term 'person' is used in its broad sense to include partnerships, associations, and corporations . . . as well as States and political subdivisions thereof." S.Rep. No. 99–345, at 8–9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273–74. Other courts have held that this language indicates that Congress interpreted the FCA as applying to states and other local governments. *Stevens,* 162 F.3d at 207; *Zissler,* 154 F.3d at 874–75; *United States ex rel. Long v. SCS Business & Technical Institute,* 999 F.Supp. 78, 85 (D.D.C.1998). The County Defendants rely heavily on *Graber,* the one case that has held otherwise. The district court's decision in that case, however, was issued after *Stevens* had been argued but before the Second Circuit issued its opinion, which effectively overruled *Graber* by holding that the FCA applied to states and local governments.[5]

### 2. The Damages Imposed by the FCA Are Not Punitive

The County Defendants argue that even if the County is a "person" under § 3729, the County is immune from suit under the FCA

---

**4.** Only *Graber* has held that states were not "person[s]" who could be sued under the act, and even *Graber* conceded that "[e]ither proffered construction arguably would be consistent with the text of the statute." 8 F.Supp.2d at 355. Moreover, *Graber* relies on the district court's decision in *Zissler,* which was reversed by the Eighth Circuit on appeal as cited above.

**5.** The district court in *Graber,* after a thorough analysis of the caselaw referenced in the Senate

Report, concluded that the report was incorrect because it misinterpreted that caselaw. *Id.* at 352. Regardless of whether Congress misunderstood the way courts had interpreted the term "person" before the 1986 amendments, however, "this understanding was that the False Claims Act applied to the States, and would, after the 1986 amendments, continue to apply to the states." *Zissler,* 154 F.3d at 874–75.

because the act imposes punitive damages. The Supreme Court has held that municipalities are immune from punitive damages in § 1983 suits. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). The Court found that imposing punitive liability on municipalities does not fulfill the traditional purposes of punitive damages, deterrence and retribution. *Id.* 453 U.S. at 267–71, 101 S.Ct. 2748.[6] Defendants concede that the Supreme Court has held that the FCA is not a punitive statute. *See, e.g., United States v. Halper*, 490 U.S. 435, 449, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) (holding that the FCA's "fixed-penalty-plus-double-damages provisions" does not, in most cases, constitute punishment for the purposes of double jeopardy), *overruled on other grounds by Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (rejecting *Halper*'s definition of "punishment" in the double jeopardy context because double jeopardy merely prohibits the imposition of additional criminal sanctions, not of all additional sanctions that might be termed punishments); *United States v. Bornstein*, 423 U.S. 303, 314–15, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976); *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551–52, 63 S.Ct. 379, 87 L.Ed. 443 (1943) ("[T]he chief purpose of the statute[ ] here was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole."). Defendants argue, however, that the foregoing cases are no longer apt, because they were decided before the 1986 amendments to the FCA. According to the County Defendants, Congress transformed the FCA into a punitive statute by revising its damages provisions to allow for treble damages rather than a fixed penalty plus double damages.

Although the Seventh Circuit has yet to address the issue, a number of other circuit and district courts have held that the FCA's treble damages provision is not punitive.

*See, e.g., Stevens*, 162 F.3d at 207; *United States v. Brekke*, 97 F.3d 1043, 1048 (8th Cir.1996); *United States v. Barnette*, 10 F.3d 1553, 1559–60 (11th Cir.1994); *Long*, 999 F.Supp. at 85–86. *But see Graber*, 8 F.Supp.2d at 349. The Supreme Court has held that the federal government "is entitled to rough remedial justice." *Halper*, 490 U.S. at 446, 109 S.Ct. 1892. *Halper* reasoned that the multiple recovery allowed under the FCA was compensatory, not punitive, because it was rationally related to the government's loss. *Id.* 490 U.S. at 449, 109 S.Ct. 1892.

■ Under *Halper*, "proportionality is the key." *Barnette*, 10 F.3d at 1560. The compensation the government requested in *Halper* was vastly disproportionate to its losses: Although the government had suffered only $16,000 in actual damages, it requested an additional fine of $130,000, a ratio of 8 to 1. *See Barnette*, 10 F.3d at 1560 (discussing *Halper*, 490 U.S. at 452, 109 S.Ct. 1892). In the present case, plaintiff claims $5 million in actual damages to the government and seeks $15 million in compensation, plus between $5,000 and $10,000 per false claim, far less than the ratio in *Halper*. Raising the stakes from double to treble damages does not render the relationship between loss and recovery irrational in the present case. *See Brekke*, 97 F.3d at 1048 (holding that a post-amendment FCA case was compensatory and not punitive) ("We do not see how the treble damages provision of the False Claims Act is different from the 'ordinary case' discussed in *Halper*," the case in which the damages were a fixed penalty plus double damages); *Barnette*, 10 F.3d at 1560 (holding that a 3.2 to 1 ratio of compensation to actual damages is not punitive).

In an attempt to argue that the FCA's treble damages provisions are penal, the County Defendants analogize the statute to the civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. Both RICO and the antitrust laws authorize treble damages. The Seventh Circuit has held that "a treble damage anti-

---

6. The parties do not dispute that City of Newport applies to counties as well as municipalities. *See Erwin v. County of Manitowoc*, 872 F.2d 1292, 1299 (7th Cir.1989) ("On a custom and policy claim a governmental body such as the County cannot be held liable under 42 U.S.C. § 1983 for punitive damages.").

trust suit is most appropriately characterized as an action for a penalty," and has likewise held that "[b]ecause a civil RICO claim is best characterized as an action for treble damages, ... such an action is penal in nature." *Tellis v. United States Fidelity & Guaranty Co.*, 805 F.2d 741, 746 (7th Cir. 1986), *vacated Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). However, the Seventh Circuit has addressed the nature of treble damages in antitrust and RICO actions for the narrow purpose of electing the state statute of limitations to apply to such actions. *See, e.g., id.* (holding that because civil RICO is penal in nature, Illinois' two-year statute of limitations for actions based on a statutory penalty applies to civil RICO claims); *Schiffman Bros. v. Texas Co.*, 196 F.2d 695, 696 (7th Cir.1952) ("[T]he real question facing us, therefore, was not whether the action was one to recover a statutory penalty within the meaning of any federal statute but whether actions such as this are limited to a period of two years under the Illinois statutes.... We are not concerned at all, then, with anything other than the question of what statute of limitations of Illinois is applicable to actions to recover treble damages.").

The Seventh Circuit has never held that treble damages are, by definition, punitive. *See, e.g., Adler v. Northern Hotel Co.*, 175 F.2d 619 (7th Cir.1949) (holding that treble damages under the Housing and Rent Act are remedial in nature). The reach of *Tellis'* holding is further undermined by language in *Agency Holding Corp.*, which held that the Clayton Act's four-year statute of limitations applies to RICO claims as well, overruling *Tellis* and other cases that had applied state law statutes of limitations to RICO claims. *See Agency Holding Corp.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121. *Agency Holding Corp.* described RICO and the Clayton Act as "designed to *remedy* economic injury by providing for the recovery of treble damages, costs, and attorney's fees," and explained that "both statutes aim to *compensate* the same type of injury." *Id.* 483 U.S. at 151, 107 S.Ct. 2759 (emphasis added). The Court's use of compensatory, rather than punitive, language to discuss the purpose of

civil RICO and the antitrust laws suggests that the two statutes' treble damages provisions are not wholly punitive in nature.

Finally, according to the legislative history, the purpose of the 1986 amendments was "to enhance the Government's ability to recover losses sustained as a result of fraud against the Government" and "to make the statute a more useful tool against fraud in modern times." S.Rep. No. 99–345, at 1, *reprinted in* 1986 U.S.C.C.A.N 5266; *see also Zissler*, 154 F.3d at 874. These broad goals suggest that Congress did not intend to place beyond the reach of the statute a large class of potential wrongdoers—municipalities, counties, and other units of local government. Taking the allegations of the complaint as true for the purposes of the present motion to dismiss, the County defendants fall within this class of wrongdoers.

The court finds that: (1) the County is a "person" for the purposes of the FCA; and (2) the FCA's treble damages provision is more compensatory than punitive. *See Stevens*, 162 F.3d at 207; *Zissler*, 154 F.3d at 875; *Taxpayers Against Fraud*, 999 F.Supp. at 78; *see also Brekke*, 97 F.3d at 1048 ("A multiple recovery of this type is compensatory rather than punitive, even though it contains a penalty element...."). The FCA applies to the County.

### B. Motion to Dismiss CCH

The County Defendants move to dismiss CCH from the complaint because the hospital does not have a legal existence separate from that of Cook County. *See Payne v. Cook County Hosp.*, 719 F.Supp. 730, 734 (N.D.Ill.1989). Because Cook County is the appropriate defendant in this action, the court grants the motion to dismiss the hospital as a separate defendant.

### C. Motion to Dismiss FCA Retaliatory Discharge Claim (Count II)

 The County Defendants move to dismiss Count II, arguing that it does not state a claim against them. The FCA's retaliatory discharge provision reads:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any

other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). The County Defendants argue that plaintiff cannot state a claim under § 3730(h) because she does not allege that she was employed by the County.

Plaintiff does not allege sufficient facts from which the court can infer that the County Defendants were her employers. Plaintiff alleges that Hektoen hired her as the New Start project director on October 1, 1993, that she was employed by Hektoen, and that Prochaska, Hektoen's administrator, ultimately fired her. Although plaintiff alleges that Dr. Mason, an employee of CCH, removed medical and childcare matters from plaintiff's responsibilities as project director, these allegations do not prove that CCH was plaintiff's employer.

At best, plaintiff alleges that Dr. Mason conspired with Hektoen to retaliate against plaintiff. The County Defendants cite a well-reasoned district court case holding that § 3730(h) liability cannot be extended to non-employers on the basis of a conspiracy. *See Mruz v. Caring, Inc.*, 991 F.Supp. 701, 709 (D.N.J.1998). The court agrees that the plain language of § 3730(h) "reflects a legislative intent to operate exclusively in the area of the 'employment relationship.'" *Id.* at 708. Although plaintiff argues that Cook County should be liable for the acts of its employees whether or not they are key decisionmakers, she does not establish as an initial matter that Cook County or any of its employees were her "employer" under the plain language of the statute. The County Defendants' motion to dismiss Count II is granted.

### D. Motion to Dismiss State Law Retaliation Claim (Count III)

The County Defendants move to dismiss Count III of plaintiff's complaint, arguing that plaintiff cannot state a claim for retaliatory discharge under Illinois law. The County Defendants also move to strike from Count III plaintiff's request for punitive damages against them. Because the court has found that plaintiff cannot state a retaliatory discharge claim and that she does not allege that the County Defendants employed her, the County Defendants' motions are granted.

### CONCLUSION

The court denies Hektoen's and the County Defendants' motions to dismiss Count I on the ground that the FCA's qui tam provisions are unconstitutional. The court likewise denies the County Defendants' supplemental motion to dismiss Count I against them on the ground that they are not suable "persons" under the FCA.

The court grants the County Defendants' motion to dismiss CCH because Cook County is the appropriate defendant in this action. Because plaintiff does not allege that she was employed by the County, the court grants the County Defendants' motion to dismiss Count II against them. Finally, the Court grants Hektoen's and the County Defendants' motions to dismiss Count III because plaintiff does not allege that her discharge violated clearly established Illinois public policy.

The court declines to stay discovery pending Cook County's appeal of the court's immunity decision. This case is already two years old. Moreover, this case will proceed against Hektoen regardless of the outcome of an appeal by the County. Even if the County were not a party to this suit, the documents plaintiff requests would be subject to subpoena, and as a non-party the County would have no claim of immunity.